Under an indictment charging murder in the first degree, appellant was convicted of murder in the second degree and the jury fixed his punishment at imprisonment in the penitentiary for a term of thirty years. He was represented by court appointed counsel and at arraignment pleaded not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent appellant on this appeal.
On Sunday night, July 17, 1977, the deceased, Donna Madeline Tucker, and her date, Mark Martin, went to the Germania Springs Park located in Jacksonville, Calhoun County, Alabama. They arrived at the park around 10:30 p.m. As they entered the park they observed a man sitting at a picnic table. The couple passed the man at the picnic table and went about fifteen yards where they spread a blanket on the ground. The lights on the tennis courts were on and lighted up the park area. Mark and Donna did not see anyone else in the park at this time. While sitting on the blanket they were approached by the man they had seen at the picnic table and he asked for a cigarette. He was told they did not have a cigarette. At this point the man was within three or four feet of the couple. A few minutes later the man returned and asked for a match. He was again within three or four feet of the couple and he was informed they did not have a match. The man was described by Martin as wearing a red wool shirt, red cap and blue jeans.
No more than five minutes later this same man approached the couple for the third time. He came from the direction of a small footbridge in the park. Donna was the first to notice him. He was holding a small pistol and walked "real close" to them. The man ordered Martin and Miss Tucker to stand up. He held the pistol to Miss Tucker's head and instructed Martin to disrobe, so that he would not run away. Martin complied with the order. The man then ordered Miss Tucker to disrobe and she took her clothes off. He told Martin to move away and sit down and Martin sat on the blanket. The man told Miss Tucker to lie down on the blanket and put the pistol to her head while he ran his hands all over her body. She started crying and began praying for the man. The man then moved over to Martin and began fondling him. Martin got a good close-up look at the man while he was fondling him. The man then returned to Miss Tucker and fondled her again with the pistol pointed at her head. Miss Tucker screamed and the man slapped her. Martin stood up and the man stood up also. As Martin walked toward the man he backed away. Martin stepped between Miss Tucker and the man and told him he was not going to put another hand on her. The man then fired the pistol twice at Martin who fell and lost consciousness momentarily. The man shot Miss Tucker as she was lying on the blanket. After a few *Page 836 
seconds Martin regained consciousness and saw the man fleeing from the park. Martin told the officers that, based on what he saw in the park before the shooting, and on those events alone, he could identify the man.
Following this heartless and bizarre shooting both victims were eventually transferred to the University Hospital in Birmingham where Miss Tucker died a few days later. Mr. Martin was paralyzed from his shoulders down. He remained in the hospital for over thirty days and was then transferred to Spain Clinic for therapeutic treatment and is now confined to a wheelchair.
Jacksonville Police Officers Thomas Fitch and Allen Hall arrived at Germania Springs Park between 12:30 and 12:45 a.m. on July 18, 1977. A maroon Monte Carlo automobile was in the parking lot with the keys in the ignition. The lights on the tennis courts automatically go out at midnight. Using flashlights the officers began looking around and discovered two nude persons lying in the picnic area. They had been shot. The male was conscious. The female was not. At this time the only light in the park was a mercury vapor light. The victims were identified as Mark Martin and Donna Tucker.
M.L. Kirby, Deputy Sheriff of Calhoun County, arrived at the scene at approximately 12:30 a.m. Mark Martin was lying on the ground and Donna Tucker was in an ambulance. Deputy Kirby next saw Miss Tucker at Cooper Green Hospital on July 22, 1977, and she was dead. Dr. James M. Buttram performed the postmortem examination.
Dr. Buttram, State Toxicologist, whose qualifications were admitted, testified that he performed the autopsy on Donna Tucker beginning at 2:30 in the afternoon on July 22, 1977; that Deputy Sheriff Kirby was present during the autopsy. The cause of death was determined to be damage to the central nervous system and hemorrhage within the cranial cavity as the result of a gunshot wound which entered the right top of the head and penetrated the right cerebral hemisphere of the brain. The autopsy surgeon removed two bullets from the head of Miss Tucker which were sealed in an envelope and given to Deputy Kirby to take to the Jacksonville laboratory.
Norma Barton testified that she knew appellant at the Pic 'N Pay Store in Oxford where he was employed. She was a customer. Appellant called her almost daily the next three weeks after she met him. This was before the shooting at Germania Springs Park. He asked her to go out with him but she never had a date with him. The week after the shooting appellant called Ms. Barton on the telephone and she recognized his voice and knew with whom she was talking. Appellant brought up the subject of the Germania Springs shooting and stated that he "didn't go any place any more because he was afraid the police would pick him up, that they had questioned him about the tennis courts." Appellant told Ms. Barton that he had been at Germania Springs that night playing tennis with some boys. Ms. Barton told appellant, "If you didn't do it, you don't have anything to worry about." Appellant responded, "But you never can tell." In this same conversation appellant stated, "You're probably lucky you didn't go out with me." Ms. Barton asked "Why," and appellant replied, "Well, because they came out and questioned me and I am an alleged sex murderer."
Terri Powell testified that she worked at the Pic 'N Pay Shoe Store in Oxford with appellant. On July 18, 1977, she had a conversation with him at the store. He told her he was at Germania Springs the night before, "where those people were shot," playing tennis with a married woman. He did not tell her the name of the woman.
Ms. Amanda Dennis, a school teacher, testified that she met appellant on Friday before the shooting Sunday night. They met in a restaurant in Anniston and talked about forty-five minutes to an hour. Appellant called her Saturday morning and again Sunday around 1:00 or 1:30 p.m. When he first called her Sunday he mentioned "going out Sunday night." She told *Page 837 
him that she was not sure whether she would be at home and to call her later that day. Ms. Dennis told him she was going to play tennis but she was unable to find a partner and went to her mother's home instead. Appellant called Ms. Dennis's apartment a number of times that evening, approximately every twenty minutes. He spoke to Ms. Linda McCullough, Ms. Dennis's roommate. He also called Ms. Dennis's mother's home at about 8:30 p.m. but did not get to talk with Ms. Dennis. When she returned to her apartment at about 10:50 Sunday night the telephone was ringing. Ms. Dennis answered the call and recognized appellant's voice. They talked for about thirty minutes — just general conversation. Appellant's voice seemed calm. Ms. Dennis did not play tennis with appellant, nor was she with him the Sunday night that the shooting occurred.
Officer W.E. Traylor, an investigator with the Alabama Bureau of Investigation, was one of the officers assigned to investigate the shooting at the park. On July 22, 1977, Traylor went to the shoe store where appellant was employed at approximately 1:00 p.m. to buy a pair of shoes. Appellant was not a suspect at that time. Traylor had known appellant since 1975 while he was investigating an unrelated crime. Appellant was not a suspect in that investigation. While Traylor was in the shoe store appellant initiated the conversation regarding the Germania Springs Park shooting. He told Traylor that he was at the park that night playing tennis with Amanda Dennis. Traylor told appellant that he needed to talk with him some more and would return when appellant was not so busy.
At approximately 4:00 p.m. that same day Traylor returned to the shoe store with Deputy Larry Amerson and they took a photograph of appellant to show Mark Martin for identification. Appellant was still not a suspect when they took his photograph. He further testified that the officers were taking photographs of everyone who was in and around the park that night and during the course of the investigation some 200 photographs were taken. On this occasion appellant gave the officers a detailed account of his actions on the night of July 17, 1977. Appellant stated that he picked up Amanda Dennis at 7:15 p.m. and they arrived at the tennis courts at about 7:30 p.m. They left the tennis courts about 9:00 p.m. and went to Chanelo's Pizza restaurant in Jacksonville, arriving at about 9:15. They left Chanelo's at about 10:00 p.m. and he took Amanda Dennis back to her car, a burnt orange colored Monte Carlo Chevrolet. She had left the car at Prichett's Jean Place in Jacksonville, on the square, while they played tennis. Appellant further stated that he left Jacksonville at 10:15 and went home. Appellant told Traylor he was driving his light blue Mercury that night. He further said that when they left the tennis courts that night some boys were still playing and he thought they were driving a white small car. Appellant stated he thought he backed into this car as he was leaving.
Appellant told Traylor he was wearing cut-off blue jeans and an off-white shirt. Amanda Dennis had on a pair of cut-off blue jeans and a loose type T-shirt and was wearing tennis shoes. They did not see anyone suspicious.
Within two weeks after this conversation with appellant Traylor attempted to verify the statement given him by appellant, and his story did not check out. On August 3, Traylor talked to appellant on the telephone and told him that his story had not completely checked out. At that time appellant was "not all that much of a suspect." Traylor said he talked to appellant in person twenty-five or thirty times and by telephone at least three times. Traylor recognized appellant's voice on the telephone and told him he needed to see him and clear up his statement. They agreed to meet at 9 o'clock that night. Traylor could not keep this appointment and they agreed to postpone the meeting until August 17, 1977. On that date Traylor could not locate appellant. He was advised that appellant had been transferred to a store in Lanett, Alabama. Traylor went to Lanett and was unable to locate appellant either at the *Page 838 
store or the place where he was staying. After returning to Anniston Traylor received a telephone call from appellant's father requesting him to come to his home. The father informed Traylor that appellant was missing. Traylor returned to the State Trooper Station in Oxford.
Traylor further testified that at approximately 3:30 p.m. that same day he received a telephone call from appellant who was in Salt Lake City, Utah. Appellant said, "This is Johnny Sparks. I am the one you want in the shooting of the Springs in Jacksonville." Traylor replied, "Wait, Johnny, you have the right to remain silent and you don't have to answer any questions at all. You are entitled to an attorney." Appellant then said, "Yes, I know all of that, but I have to get this off my chest." Appellant stated that he was the one who shot the people in the park, that he didn't mean to shoot the people, and that it was about to drive him crazy. Traylor told appellant that his parents were worried about him and he asked appellant if he wanted to return on his own. Appellant asked Traylor to call his parents and tell them he was okay, but not to tell them he was involved in the shooting. Appellant told Traylor that he did not have enough money to return on his own. Traylor asked appellant if he would like for him to call the police there and see if they would pick him up and give him a place to stay until he could come and pick him up. Appellant stated he was in a bus station and the telephone number was 532-8825, and that he would stay there while Traylor checked with the Salt Lake City authorities. Appellant continued talking and stated he tried to give Traylor a hint when they talked in the shoe store. Traylor replied, "Yes, I figured that because of the three pages (referring to notes made by Traylor after his interview with appellant in the store) you told me about, two of them were lies." Appellant said, "Yes, I figured you would get the hint." Traylor then called the Salt Lake City police, and arranged to pick appellant up as he had requested.
The Salt Lake City police officers were dispatched to the bus station to look for an Alabama suspect. When appellant saw the officers he was outside the building. He ran downstairs into a basement restaurant where he grabbed a hostage, Harold Holsite, and held a knife to his throat. Appellant testified, "I grabbed the person and I pulled him around between me and the police officer, who came about half way down the stairs." He denied that he had a knife at that time, but stated that later he did pull a knife. Holsite testified that appellant yelled, "Everybody get out or else I'm going to hurt this guy." Holsite further testified that appellant said, "I don't want to hurt anybody. I don't want to hurt you. I don't want to hurt anybody any more." Holsite said that appellant stated the police were after him for murder.
When appellant tried to leave the restaurant with the hostage he was arrested by Officer William English of the Salt Lake Police Department. Officer English was able to make an in-court identification of appellant based upon observing him at the time of the arrest.
Mr. Robert VanSkiver, a Utah attorney, testified on voir dire that he received a telephone call on August 17, 1977, from Mr. Todd Caldwell, an Alabama attorney, on behalf of appellant's mother. Mr. VanSkiver was retained to represent appellant in Utah and he met with appellant that evening.
Officers Traylor and Kirby went to Utah on August 19, 1977, to pick up appellant. They talked to Mr. VanSkiver over the telephone that morning around 8:30 o'clock. Appellant was arraigned that morning and he and Mr. VanSkiver met with the Alabama officers at about 10:30 a.m. Mr. VanSkiver told the Alabama officers they could not talk to appellant.
Appellant was arraigned on the fugitive warrant from Alabama. He had previously been arraigned on a Utah kidnap charge. Mr. VanSkiver described appellant's appearance at the arraignment as "noticeably shaking, and he was shivering . . . he was sweating, he asked me to assure him that the Judge would not hurt him. He *Page 839 
kept saying that he was hearing things and that he was seeing things." He further testified that appellant was heavily manacled which was unusual for Utah practice. Appellant's behavior caused Mr. VanSkiver concern and he filed a motion in court asking that appellant be committed to the State hospital for observation. This motion was granted and appellant was committed on August 22, 1977, for thirty days and was determined to be competent. Mr. VanSkiver expressed the belief that on August 19, 1977, appellant was not capable of understanding either his rights or the nature of the proceedings against him.
Mr. VanSkiver and appellant met with Officers Traylor and Kirby at the jail after the arraignment. Mr. VanSkiver did not permit the Alabama officers to question appellant. The officers did ask some general questions including one Mr. VanSkiver felt was inculpatory but appellant did not answer it. Mr. VanSkiver was afraid that the Alabama officers would talk to appellant when he was unavailable. With the jail sergeant as a witness, in the presence of appellant and the officers, Mr. VanSkiver instructed the officers not to indulge in any inquiry of appellant in his absence. Shortly thereafter, in a lengthy conversation with the Alabama officers, Mr. VanSkiver again told the officers not to question appellant in his absence. He described appellant's condition at the arraignment to them and expressed his concern for appellant. Mr. VanSkiver spoke with Officer Traylor again on August 19 at about 1:00 p.m. by telephone and he again denied the officer permission to talk to appellant.
At about 7 o'clock that night the Alabama officers went back to the jail and had a lengthy meeting with appellant in the absence of his lawyer. Appellant told the officers that, after he called Officer Traylor on August 17 and said he shot the people in the park he couldn't stand the thought of coming back to Alabama. He called the Salt Lake City police. He wanted them to kill him. Appellant also told the officers about his apprehension by the police at the restaurant and that he had taken a hostage at knife point. He talked about his activities the night of the shooting but he did not say that he shot the couple. Appellant signed a waiver of rights form and Officers Traylor and Kirby returned to Alabama. On motion of appellant the statements made at this meeting were excluded from the jury and the jury was charged to disregard these statements in their deliberations. These statements were most incriminating but they were taken in violation of the instructions of appellant's Utah lawyer.
Mr. VanSkiver stated that after appellant waived extradition to return to Alabama his representation of appellant terminated.
On October 7, 1977, Officers Traylor and Kirby drove an official car to Salt Lake City to return appellant to Alabama. He had previously waived extradition. The officers and appellant left Salt Lake City at 8:00 a.m. on October 8, and arrived in Anniston at 4:30 p.m. on October 10. The officers advised appellant of his Miranda rights and warnings before leaving Salt Lake City and each successive morning during the return trip. Appellant said he understood his rights.
During the trip the officers and appellant intermittently discussed the shooting in the park and appellant's flight. Officer Traylor testified that, on October 8, 1977, appellant made the following statement in substance:
 "Johnny told us that he couldn't believe that we hadn't found the pistol. He asked if the crime carried the death penalty and we told him that we weren't sure of that status. And he said he was interested in keeping his rear out of the electric chair. I asked him why he did that and he said, `I don't know. I was there, they were there, the opportunity was available. I just did it. I may never know why I did it. I was drinking and taking drugs.'"
Appellant made no statement on October 9 but on October 10, after again being advised of his constitutional rights, appellant stated that he "would not be in this trouble if it had not been for the high classed bitch in Jacksonville that he had went up there to see." *Page 840 
Appellant denied making the statement, "I don't know why I did it. I was there and they were there." He also denied the statement, "I'm surprised you haven't found the gun." He admitted he signed the waiver of rights form but said he did not read it.
A lineup was held on October 27, 1977, in a hospital room in Spain Rehabilitation Clinic in Birmingham where Mark Martin was recuperating. Appellant and four other white males were placed in a room with a one-way mirror. Without the slightest hesitation Martin picked appellant as being the man in the park the night of the shooting and the man who shot him and Ms. Tucker. At this lineup appellant was not represented by counsel. The officers testified they tried to call appellant's attorney from Birmingham prior to the lineup but were unable to locate him. Upon being informed the officers could not locate his lawyer appellant told the officers that he was smarter than his lawyer and to go on with the lineup without his counsel.
A voir dire hearing was conducted out of the presence and hearing of the jury on the motion to suppress appellant's confessory statement. This was a very lengthy hearing, covering many pages of the transcript. The officers testified that appellant was not threatened, coerced, made any promises, offered any rewards or other inducements to get him to make a statement. During appellant's testimony on voir dire the trial court interrogated him and appellant told the court that he understood all his rights and had understood them as early as junior high school. At the conclusion of this hearing the court ruled that the statements given the officers in Salt Lake City were inadmissible as being contrary to the express instructions of his attorney and in his absence, but all statements made by appellant on the return trip to Alabama were held to be admissible. These incriminating statements were introduced into evidence before the jury.
Mark Martin made a positive in-court identification of appellant as his assailant at the Germania Springs Park on the night of July 17, 1977. The evidence reflects that Martin saw appellant that night three times over a twenty minute period, each time from a distance of one to four feet. On one occasion appellant was close enough to fondle Martin. The testimony shows that the light from the tennis courts was bright and sufficient for Martin to see the man clearly. Martin's identification was based upon the events which occurred at the park and independent of the lineup identification though the lineup identification was unequivocal and cannot be disregarded.
On rebuttal Mark Martin testified that he did not see Donald Bushy at the park the night of the shooting and had never seen him.
Appellant called one Donald Eugene Bushy as an adverse witness. He testified that he was in the park the night of the shooting but he did not shoot the couple. Defense counsel sought to show that on January 10, 1978, Bushy had given the police a statement that he shot the couple in Germania Springs Park. The court held that appellant may prove that another committed the crime but must do so by substantive facts. The court noted that Bushy was called by the defense as a hostile witness.
On cross-examination Bushy testified that he owned a .22 caliber pistol and he had it in the car with him that night. He was not wearing anything on his head that night. He was sitting in his car and heard approximately four shots. He saw two people on the ground and saw a man running. He did not notify the police. He admitted he had served a prior jail term for indecent exposure. He had also pleaded guilty to murder, rape, and assault with intent to murder in a killing on Broadwell Mill Road. He had assaulted a young couple in an automobile. Bushy stated that he saw the man running from the park and he had on overalls; he was big, heavy-set, and was "clumping along."
Bushy's wife testified that on the night of the shooting her husband came home at approximately 11:10. He had on a light blue shirt and dark green pants. His clothes were wet and muddy. He unloaded his gun and had five empty shells in it. He *Page 841 
filed the barrel with a chainsaw file. He put his cap, a bright orange bibbed cap, in the garbage. They took their niece to the hospital and while they were there an ambulance arrived with the shooting victims. Her husband did not come into the hospital until after the ambulance left.
On cross-examination she admitted she was aware of the $10,000.00 reward which had been posted for the apprehension and conviction of the killer in the Germania Springs Park crime.
Edwin Seager, a clinical psychologist at Bryce Hospital, testified that he had evaluated appellant at Bryce for two months. He diagnosed appellant as possessing a hysterical personality characterized by excitability, emotional instability, and self-dramatization. He was given a hypothetical version of the events of the shooting and stated such conduct would be inconsistent with appellant's personality. He said appellant is not psychotic or schizophrenic but has a personality disorder. He stated that hysterical personalities could confess to a crime they did not commit. He further testified that appellant had an unusual dislike for Officer Traylor and would have been very likely to give misinformation to him.
We note here that appellant was ordered sent to Bryce Hospital by the Circuit Court of Calhoun County with the view of determining the mental condition and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime. The order was dated March 20, 1978. On June 14, 1978, the Lunacy Commission filed with the court the following report:
 "It is the opinion of the Lunacy Commission that Mr. Sparks exhibits no evidence of mental disorder which would affect his criminal responsibility, either now or at the time of the alleged offense. Mr. Sparks understands the nature of the charge against him and can communicate with his attorney to assist in the preparation of his defense at this time."
This report was signed by Thomas L. Smith, M.D., Psychiatrist, James C. Thompson, M.D., Psychiatrist, and T.J. Callander, Superintendent.
Appellant contends that his constitutional rights were violated when he was placed in a lineup in the absence of his counsel. He relies on Gilbert v. California, 388 U.S. 263,87 S.Ct. 1951, 18 L.Ed.2d 1178. Gilbert involved a post-indictment lineup and reliance on it in this case is misplaced. The lineup in the instant case was a pre-indictment lineup. There is no constitutional right to counsel at a pre-indictment lineup.Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411;Deloach v. State, Ala.Cr.App., 356 So.2d 222. Ala. Dig. Crim. Law 641.2.
Though in this instance the defendant did not have the right to counsel furnished to him by the State, he had employed counsel and had a right to have him present. The record reflects that the defendant voluntarily, knowingly, waived the presence of counsel. When the officers attempted to phone the defense counsel, the defendant stated, "Let's go ahead and get this thing over with; I'm smarter than the damn lawyer anyway. Let's get it over with." Upon examination by the court the defendant testified that he understood his rights and had understood them since at least 1974 and probably since he was in junior high school. The defendant was not denied right to counsel if he intelligently and understandably rejected offer of counsel; Henry v. State, 46 Ala. App. 175, 239 So.2d 318; Exparte Allison, 42 Ala. App. 507, 169 So.2d 436; Smith v. State,49 Ala. App. 147, 269 So.2d 164.
Where in-court identification of the accused is established by clear and convincing evidence based upon observation of the accused, prior identification without counsel's presence does not constitute reversible error. Hatchet v. State, Ala.Cr.App.,335 So.2d 415. Considering the totality of the surrounding circumstances, the rights of the defendant were not violated.Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. *Page 842 
The defendant contends that statements made by a defendant are not admissible if taken under circumstances which violate the Fifth, Sixth and Fourteenth Amendments. He cites Escobedov. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977;Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694; Massiah v. U.S., 377 U.S. 201, 84 S.Ct. 1199,12 L.Ed.2d 246; Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232,51 L.Ed.2d 424.
Specifically, the defendant takes issue with the admission at trial of the statements made by the defendant during the return trip to Alabama. The defendant contends:
 "The trial court held that Escobedo v. Illinois and Miranda v. Arizona had been complied with. This is, however, not the case since the officers would advise the defendant of his right once and then question him off and on throughout the three day trip. In this case, such continued questioning resulted not only in violation of the Defendant's Fifth Amendment violation, but in his Sixth Amendment rights to counsel as well."
The testimony conflicts as to the circumstances surrounding the return trip. Officer Traylor testified that on the return trip, which covered October 8, October 9, and October 10, the officers read the defendant his rights each morning. The defendant's rights were given from a pocket card which reads:
 "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have one present while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one."
Appellant's signed waiver of rights was introduced into evidence as State's Exhibit No. 1.
Traylor testified that he asked the defendant if he understood and he said he did. The court examined the defendant and he stated that he understood his rights since at least 1974.
The court examined Traylor as to each day of the return trip. Traylor testified that the rights were given on each day and that the defendant did not ask for an attorney. Traylor testified that they did not threaten the defendant, coerce him, offer him any reward or hope of reward, or promise of any kind to make a statement.
The defendant's testimony contradicted Traylor's. He testified that he stated on the first day that he did not wish to discuss the incident and that he wished to see an attorney. He testified that he asked again to see an attorney on the third day of the return trip. According to the defendant they discussed a guilty plea to murder in the second degree, thus allowing the defendant to continue his education.
The matter of admissibility of a confession in the first instance is addressed to the trial judge. Its weight and credence are addressed to the jury. Botsford v. State,54 Ala. App. 482, 309 So.2d 835.
This issue is governed by the principle that, where the trial judge finds on conflicting evidence that a confession, or incriminating statement, was voluntarily made, such finding will not be disturbed on appeal unless it appears contrary to the great weight of evidence or is manifestly wrong. Burks v.State, Ala.Cr.App., 353 So.2d 539, and cases cited therein.
 "Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty." McNair v. State, 50 Ala. App. 465, 470, 280 So.2d 171, 176
(1973).
The trial judge did not err in his determination that the confession was knowingly and voluntarily made.
The defendant also contends that evidence of other crimes is inadmissible against an accused in a criminal case, citingIngram v. State, 39 Ala. 247, and Hinton v. State, 280 Ala. 48,189 So.2d 849. *Page 843 
On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. Loggins v. State, 52 Ala. App. 204,290 So.2d 665 (1974). "This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question . . . This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds." Gamble, McElroy's Alabama Evidence (3rd 1977) § 69.01 (1), p. 135.
An analysis of the acts in question and the purpose for which the State introduced them are essential. The defendant objected to the introduction by the State of the defendant's actions in and near the Utah bus station where he was apprehended. The defendant, using a knife, took a hostage in an effort to elude capture and to resist arrest. The evidence was introduced to put before the jury statements made by the defendant. The defendant stated to the hostage and others present, "I don't want to hurt anyone any more," and indicated that he was wanted for murder in Alabama.
Any conduct or declaration of a person having relation to the offense he is suspected of or charged with, indicating a consciousness of guilt, is admissible evidence against him.Conley v. State, Ala.Cr.App., 354 So.2d 1172. The acts, declarations and demeanor of the accused, before or after the offense, whether a part of the res gestae, are not admissible by him. Evans v. State, Ala.Cr.App., 338 So.2d 1033, cert. denied Ex parte Evans, Ala., 348 So.2d 784. The State may prove that the accused was engaged in flight to avoid prosecution.Kimbrough v. State, Ala.Cr.App., 352 So.2d 512, certiorari denied, Ala., 352 So.2d 516. An officer making an arrest is competent to testify as to what took place at the time the arrest was being made, and to testify regarding anything said by the defendant indicating resistance to the arrest. Nicholsv. State, 27 Ala. App. 435, 173 So. 652.
The record reflects the State did not introduce the evidence of the incident in Utah for the purpose of establishing the bad character of the accused. The State introduced the evidence to show the accused's consciousness of guilt, his flight and the circumstances of his arrest, all legitimate purposes.
Appellant received a fair and impartial trial and that is all he was entitled to under the law. He was represented by able and competent lawyers whose resourcefulness, dedication and ingenuity played a great part in the sentence being not more than thirty years.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is, in all things, affirmed.
AFFIRMED.
All the Judges concur. *Page 1083