[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 117 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 118 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 119 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 120 
Marcus Pressley appeals from his conviction for two charges of capital murder, see § 13A-5-40(a)(2), Ala. Code 1975. Pressley was tried before a jury on the charges that he murdered John Burleson and Janice Littleton during a robbery in the first degree. Following a guilty verdict on both counts, the jury recommended, by an 11-1 vote, that Pressley be sentenced to death. On October 10, 1997, the trial court sentenced Marcus Pressley to death. This appeal follows. We affirm.
The State's evidence tends to show the following. On the afternoon of July 25, 1996, Marcus Pressley, then 16 years old, entered John's 280 Pawn, a pawnshop on Highway 280, Shelby County, Alabama. A store surveillance camera showed Pressley looking around the store, asking about merchandise, and then leaving the store. Pressley returned to the pawnshop 30 minutes later with LaSamuel Gamble. Inside the shop were John Burleson, the owner, and an employee, Janice Littleton. Pressley and Gamble were armed with handguns and proceeded to rob the pawnshop. Forcing Burleson and Littleton to *Page 121 
lie down on the floor behind the counter, Pressley and Gamble spent 15 minutes, in broad daylight, going through the shop, taking guns, jewelry, and about $2,300 cash. Before leaving the store, Pressley approached Burleson and Littleton, who were lying on the floor and, standing over them, shot both of them in the head. As he did so, his .380 revolver repeatedly jammed and Pressley would have to stop and clear the gun before it would fire. Pressley shot John Burleson twice, one bullet striking him in the chin, and the other bullet entering his head above the right eyebrow and travelling through his brain, killing him. Pressley shot Janice Littleton in the back of the head. Burleson died at the store; Littleton was alive when the police arrived, but she subsequently died at the hospital from the gunshot wound. The surveillance camera recorded the entire robbery, including Pressley's shooting Burleson and Littleton.[1] The camera also recorded another person later identified as Steve McKenzie from Boston, Massachusetts, who stayed outside with the truck Pressley and Gamble were driving. An extensive police manhunt led investigators from Shelby County to Birmingham and then to Boston, where Steve McKenzie was apprehended and several of the stolen handguns were recovered. Police then followed Pressley's trail to Norfolk, Virginia, where he was arrested.
 I.
Pressley argues that the trial court committed reversible error by conducting individually sequestered voir dire on the entire venire. Specifically, he objects to the physical arrangement under which the individual voir dire was conducted, and argues in his brief to this court that individual voir dire prejudiced him by giving the prosecutor a "free hand" to
"1. Make `nice' with each juror;
 "2. Give speeches and educate the juror[s] on how to answer questions in order to survive a challenge for cause on the death penalty issue;
 "3. Identify and eliminate every juror who [did] not favor the death penalty but who could nonetheless follow the Court's instructions on the sentencing issue in the penalty phase;
 "4. Obtain pretextual reasons for removing as many African-American jurors from the jury as possible;
 "5. Prejudice the jurors by telling them the Alabama legislature might change the law pertaining to life without parole and someday someone serving life without parole for capital murder might be paroled from prison."
(App.Br. pg. 8.) The record reflects that Pressley made a pretrial motion asking the court to conduct individually sequestered voir dire on those veniremembers who indicated that they had been exposed to pretrial publicity. The trial court decided to conduct individually sequestered voir dire on every veniremember on the subject of pretrial publicity and the imposition of the death penalty. Pressley did not object to this arrangement. During voir dire, the trial court conducted a preliminary voir dire of the venire as a whole, and then allowed both prosecutor and trial counsel to conduct a voir dire examination of the venire. After that voir dire examination, the venire was asked to complete a juror questionnaire. Upon completion of the questionnaire, each veniremember was individually questioned by the court and by counsel. Not once during the individual voir dire did Pressley object to this procedure, or to the physical arrangements *Page 122 
made for individual voir dire. Because Pressley did not object to individual voir dire, we review this issue under the plain error rule. Rule 45A, Ala.R.App.P. We note that the failure to object at trial weighs against any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 489
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886
(1991).
We divide this issue into separate discussions of any error resulting from the trial court's allowing individual voir dire as to all veniremembers and any error resulting from the physical arrangements for voir dire, which Pressley says allowed the prosecutor to ingratiate himself with the venire. The remaining arguments alleging improprieties by the prosecutor during voir dire will be addressed elsewhere in this opinion.
 A.
Any error that resulted from the trial court's conducting individually sequestered voir dire is invited error.
 "A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own action. Leverett v. State, 462 So.2d 972 (Ala.Cr.App. 1984), cert. denied, 462 So.2d 972 (Ala. 1985). A defendant cannot invite error by his conduct and later profit by the error. Timmons v. State, 487 So.2d 975
(Ala.Cr.App.), cert. denied, 487 So.2d 975 (Ala. 1986)."
Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App. 1991). "The invited error rule has been applied equally in both capital cases and noncapital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 88 (Ala. 1992). Because Pressley moved for individually sequestered voir dire and encouraged the trial court to conduct individual voir dire on the entire venire, he is estopped from raising this issue on appeal. Johnson v. State, 620 So.2d 679, 695
(Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993).
 B.
We now review Pressley's argument that the physical arrangements for individual voir dire prejudiced him by allowing the prosecutor to "make nice" with the veniremembers. Pressley seems to argue that because the prosecutors sat closer to the veniremembers than did defense counsel, they were able to become inappropriately familiar with the venire.
 "`"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App. 1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504
(1995). . . .
"`. . . .
 "`". . . As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021
(Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019
(1988). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir. 1981); Waldrop v. State."'"
Hyde v. State, [Ms. CR-95-2036, January 30, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998), qouting Stewart v. State, 730 So.2d 1203,1242-43 (Ala.Cr.App. 1996).
We have reviewed the entire transcript of the voir dire examination and cannot find in the record a description of the physical arrangement for the individual voir dire. Pressley never objected to the room, the table, or the seating arrangements *Page 123 
for the individual voir dire. Only on appeal has Pressley advised the court that the individual voir dire was conducted in a law library adjacent to the courtroom with the parties sitting around two rectangular tables placed end-to-end. Likewise, we have searched the record for instances where the prosecutor became improperly familiar with veniremembers to the prejudice of Pressley. We can find nothing to support the broad allegation of misconduct in Pressley's brief to this court.
This court cannot predicate error on matters as to which the record is silent. "An appellate court may only consider the facts contained in the record on appeal, and it may not presume any facts not shown by that record and make them a ground for reversal." Carden v. State,621 So.2d 342, 346-7 (Ala.Cr.App. 1992). Thus, there is nothing in the record before us to support Pressley's argument that he was prejudiced by the physical layout and the seating arrangements of individual voir dire or that the prosecutor became improperly familiar with the veniremembers. We will not hold a trial court in error based on the bare, unsupported speculations asserted in an appellant's brief. Burgess v. State, 723 So.2d 742, 762 (Ala.Cr.App. 1997).
 II.
Pressley argues that he was denied a fair trial because, he says, the prosecutor "tried to rehabilitate a juror in front of the entire panel of the jurors on the death penalty issue." Pressley cites this court to the page in the record where he objected to some rehabilitation questions, but does not address what specific questions he believes denied him a fair trial. In reviewing the record, we can find only one instance near to Pressley's objection in which the prosecutor mentioned the death penalty. The prosecutor asked if anyone in the venire knew the victim, John Burleson. Juror W. and Juror S. both stated that they had known Burleson. Juror W. then expressed a concern about whether she could be impartial. The following discourse then took place:
"MR. OWENS [Prosecutor]: And why is that?
 "JUROR W.: Well, maybe if I heard the evidence, possibly, but —
 "MR. OWENS: Is that because this is a death penalty case or because you don't think you could issue judgment on another human being, period?
"JUROR W.: I believe I could do that.
 "MR. OWENS: You believe you could make a judgment based on the facts?
"JUROR W.: Yes.
 "MR. OWENS: But you don't think you could render a verdict in a death penalty case?
"JUROR W.: Yes, I do.
"MR. OWENS: Okay.
 "JUROR W.: But I just want you to know that I did know [Burleson].
"MR. OWENS: And it might have a bearing —
"JUROR S.: Uh-huh.[2]
 "MR. OWENS: My question really then is could you set your personal opinion aside, follow the law that the Judge gives you and make a . . . finding based upon the facts that are actually represented in this courtroom, not something that you may have seen and [knew] about at the time, but the facts that come here before you and that you would render a verdict if you were a juror based upon those facts and the law that the Judge gives you and come to a conclusion based upon those facts?
"JUROR S.: Yes, I could.
 "MR. OWENS: And upon finding of that — take a large step forward. And this is pure supposition, but if the supposition were to arise for a finding of guilt, *Page 124 
could you then properly consider either death or life without parole, whichever you thought was the right thing based upon the law as the Judge gives it to you?
"JUROR S.: Yes."
(R. 137-39.)
The crux of Pressley's argument is that he believes the prosecutor was using this voir dire to somehow improperly "educate the [venire] on how to answer questions in order to survive a challenge for cause on the death penalty issue."
The purpose of voir dire is to provide sufficient information on the jurors to enable the trial court to make a meaningful determination as to whether the veniremembers could be impartial. "The method of determining impartiality is not critical." Brown v. State, 632 So.2d 14, 17 (Ala. 1992). "The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case." Smith v. State, 698 So.2d 189, 198
(Ala.Cr.App. 1996).
We do not think any question asked by the prosecutor during his voir dire was improper. Nor do we find any impermissible motive for asking such questions of the veniremembers. Juror W. had expressed a concern about her ability to be impartial because of her knowledge of the victim, and the prosecutor was trying to determine the nature of her concern. Even if the prosecutor's questions educated the entire venire about their need to be impartial and fair and what the law required for a juror to be impartial, those questions were not incorrect or unfair. There is absolutely no indication in the record that any veniremember used any information he or she may have gained from the questions of the prosecutor to hide true beliefs or biases from the trial court. The trial court did not abuse its discretion in allowing such questions to be asked of the venire. Nodd v. State, 549 So.2d 139, 144-45 (Ala.Cr.App. 1989).
 III.
Pressley next argues that, during voir dire, the prosecutor improperly told veniremembers that "although `life without parole' meant life imprisonment without the possibility of parole under the current law, the legislature could change the law in the future," implying that, unless the death penalty was imposed, Pressley might someday be released from prison.
The record reflects that the prosecutor argued to the trial court, outside the presence of the jury, that he should be allowed to ask jurors if they understood that the current law providing for life imprisonment without parole could be changed in the future by the legislature. The prosecutor argued that the "question" was a proper response to a defense question about the jurors' understanding of the meaning of life imprisonment without parole. However, the record also reflects that the prosecutor asked this question only of the first veniremember questioned during individual voir dire. After defense counsel had completed voir dire, the prosecutor asked Juror A. this question:
 "One last question. John [defense counsel] made the comment to you and you understand that life without parole means life without parole. You also understand that that's under current law and any law is subject to change by the legislature — "
(R. 341-42.) The "question" was interrupted by an objection from defense counsel. After a discussion outside the juror's presence, Juror A. was released from voir dire without any further questions. Neither side challenged her for cause, and the trial court instructed her to not discuss her voir dire with any other jurors. Ultimately, Juror A. was removed by a peremptory challenge made by Pressley. Before the jury began its deliberations on sentence, the trial court instructed the jurors: *Page 125 
 "Life imprisonment without parole means life imprisonment without parole. That is the law of this state that if you sentence this defendant to life imprisonment he will never be paroled."
(R. 1762.)
We treat this issue as one alleging improper argument. Although the prosecutor asked the question during voir dire examination, the object of the question was not to test the fitness of the juror, but to bring information to the juror.
Informing the jury that the legislature may change the definition of life imprisonment without parole in the future is improper. "It has long been the law of this State that comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute improper argument." Ex parte Rutledge, 482 So.2d 1262, 1264 (Ala. 1984); Eaton v. State, 278 Ala. 224, 177 So.2d 444 (1965); see also Murray v. State,359 So.2d 1178 (Ala.Cr.App. 1978).
Determining that the prosecutor's question to Juror A. was improper does not, however, end our review. Prosecutorial misconduct is subject to a harmless error analysis. Smith v. State, 698 So.2d at 202. In reviewing improper prosecutorial argument, the standard of review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala. 1986). In this case, the comments of the prosecutor to Juror A. could not have influenced the jury in its sentence deliberations. Only Juror A. was privy to those comments. She was instructed not to discuss her individual voir dire with any other veniremembers. We will presume Juror A. followed the instructions given by the trial court. Taylor v. State, 666 So.2d 36,71 (Ala.Cr.App.), aff'd on return to remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120
(1996). Pressley did not challenge Juror A. for cause, but instead used a peremptory strike to excuse her from the jury. Thus, Juror A. never participated in the deliberations that led to the recommendation of the death sentence. Without Juror A. on the jury, the only information the jury had before it on the sentence of life imprisonment without parole was the instruction of the trial court. Because Pressley was not prejudiced in any way by the comments of the prosecutor to Juror A., we hold that the prosecutor's improper question was harmless error. See Williams v. State, 710 So.2d 1276, 1324 (Ala.Cr.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325
(1998).
 IV.
Pressley argues that the trial court erred in refusing to grant his challenges for cause against eight members of the venire.
 A.
Pressley argues that Juror D.A., Juror C.B., Juror P.B., Juror J.K., Juror J.R., Juror C.R., and Juror L.W. should have been removed from the venire because each responded "yes" to the following question presented in the juror questionnaire: "Would you automatically vote for the death penalty for someone who is found guilty of an intentional killing? Yes ____ No ____." Pressley based his challenges for cause on the jurors' response to the question, and now claims that the trial court erred in denying his challenges, even though those veniremembers who responded "yes" moderated or changed their views during individually sequestered voir dire.[3] *Page 126 
We have reviewed the voir dire examination of these seven veniremembers. Some of the veniremembers changed their minds after reflecting on their response on the questionnaire; others admitted that they had not understood the question when they answered as they did. Some of these veniremembers — often in response to a cross-examination style questioning — indicated that they were in favor of, or were even inclined to impose, the death penalty. However, the record reflects that, once the trial court explained the applicable law and procedure to these jurors, each veniremember indicated that he or she could follow the trial court's sentencing instructions, could consider all options in sentencing, and would not automatically vote to impose the death penalty. See Hagood v. State, [Ms. CR-95-1915, August 14, 1998] ___ So.2d ___ (Ala.Cr.App. 1998).
 "[A] preference [in favor of the death penalty], where the potential juror indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.
 "`[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. "A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970
(1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id.'
 "Smith v. State, 698 So.2d 189 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala. 1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997)."
Price v. State, 725 So.2d 1003, 1024 (Ala.Cr.App. 1997), aff'd,725 So.2d 1063 (Ala. 1998). We find no abuse of discretion in the trial court's refusal to grant Pressley's challenges for cause as to these seven jurors. Ex parte Taylor, 666 So.2d 73, 82 (Ala. 1995).
 B.
Pressley also argues that the trial court erred in not granting a challenge for cause against Juror A.S. because the juror indicated that he believed Pressley was "probably" guilty and he responded "yes" when defense counsel asked him if he would require some proof by the defense before he could acquit Pressley.
Juror A.S. said that he thought the ratio between the number of indictments in Shelby County and the number of resulting convictions was high. He therefore agreed with the proposition that because Pressley had been charged with a crime, he was "probably" guilty. However, Juror A.S. also said that he felt he could listen to the evidence and base a verdict on the evidence he heard in the courtroom. He also stated that he could set aside any preconceived notions he had about Pressley's guilt. He specifically stated that he did not consider Pressley guilty before the presentation of evidence. *Page 127 
He told the trial court that he would follow the law as it was given to him by the court.
 "Section 12-16-150, Code of Alabama 1975, provides that, when a juror `has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict,' a challenge for cause is proper. Nobis v. State, 401 So.2d 191 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala. 1981). The juror must have more than a bias or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769 (Ala.Cr.App. 1978); McCorvey v. State, 339 So.2d 1053 (Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala. 1976); Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234."
Thomas v. State, 539 So.2d 375, 380 (Ala.Cr.App.), aff'd, 539 So.2d 399
(Ala. 1988), cert. denied, 491 U.S. 910 (1989).
 "`Ultimately, the test to be applied is whether the juror can set aside [his] opinions and try the case fairly and impartially, according to the law and the evidence. This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.'"
Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App. 1991), quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989) (citations omitted). A review of the entire voir dire examination of Juror A.S. reveals that, once the trial court explained the law to him, Juror A.S. stated that he would follow the law as instructed to him by the court and that he could fairly try the case. There is no indication in the record that Juror A.S. had a fixed opinion as to Pressley's guilt that would affect his verdict. The trial court did not abuse its discretion in declining to grant Pressley's challenge for cause as to Juror A.S.
 V.
Pressley argues that the trial court erred when he granted a challenge for cause as to Juror G.D. based on her opposition to the death penalty. Pressley maintains that, even though Juror G.D. stated that her moral beliefs would prevent her from voting to impose the death penalty, she stated that she could fairly consider the death penalty.
The "original constitutional yardstick" on this issue was described in Witherspoon v. Illinois, 391 U.S. 510 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremember's views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Supreme Court has expressly stated that juror bias does not have to be proven with "unmistakable clarity." Darden v. Wainwright, 477 U.S. 168 (1986).
When Juror G.D. was first asked about her opposition to the death penalty, the following dialogue occurred:
 "JUROR G.D.: I just — that's the way I feel. I come from a Holiness Church and therefore, I mean, I just couldn't — *Page 128 
 "MR. HILLMAN [Prosecutor]: Okay. You just — under any set of circumstances you couldn't give the death penalty?
"JUROR G.D.: No."
(R. 571-72.)
After this examination, defense counsel asked G.D. if she could follow the judge's instructions, to which she responded that she could. Then the following occurred:
 "MR. ROBBINS [Defense counsel]: And if the judge told you that in the penalty phase of this case, if they got there, that you are to consider as an option both the death penalty and life without parole, could you follow that?
"JUROR G.D.: Uh-huh. Yes."
(R. 573-74.)
When the prosecutor pointed out to G.D. that she had given different answers to essentially the same question, the following occurred:
"JUROR G.D.: I couldn't do it.
"MR. HILLMAN: You couldn't do it.
 "JUROR G.D.: I mean, by me being like I am, I mean, that's [the] way I feel. I mean —
 "MR. OWENS [Prosecutor]: You just told him something different. That's why we're going —
"JUROR G.D.: Yeah. Okay.
 "MR. OWENS: So, I guess what we want to know, would you consider the death penalty or would you just not do it?
"JUROR G.D.: I wouldn't.
"MR. OWENS: Not under any circumstances?
"JUROR G.D.: I just — I couldn't. I mean —
 "MR. OWENS: If the Judge told you you had to consider the death penalty, you just couldn't for your personal —
 "JUROR G.D.: I mean, that would be my choice, right? I mean —
 "MR. OWENS: Yes. That's your choice. You are entitled to that. We are not trying to make you do something that — yeah, we just want to know how you feel.
 "JUROR G.D.: Well, I couldn't. Point blank. I just couldn't.
"MR. OWENS: Not under any circumstances.
"JUROR G.D.: No."
(R. 575.)
All the lawyers then questioned Juror G.D. further, and G.D. agreed that she could follow the trial court's instructions but insisted that she wouldn't impose the death penalty under any circumstances. When the trial court took up the questioning, Juror G.D. finally responded, "I couldn't sit. I mean, I couldn't sentence — I mean, I couldn't do it. I mean, you know what I am saying. I mean —" (R. 581.) At that point, the trial court cut off further questioning, excused the juror from the room, and struck Juror G.D. for cause. (R. 581-82.)
After reviewing the voir dire examination, we conclude that the trial court did not err in granting the challenge for cause against Juror G.D. The trial court could reasonably have concluded — when assessing the repeated comments by G.D. that she "couldn't do it," in conjunction with her demeanor — that she meant that she believed unequivocally that she could not impose the death penalty regardless of the evidence presented or that her views would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions of the court and her oath. See Watkins v. State, 509 So.2d 1071, 1073
(Ala.Cr.App.), aff'd on remand, 509 So.2d 1071 (Ala.Cr.App. 1986), aff'd, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918 (1987), and the cases cited therein.
 VI.
Pressley argues that the trial court erred when it denied his motions challenging the prosecution's peremptory strikes against blacks and women on the venire, made pursuant to Batson v. Kentucky, *Page 129 476 U.S. 79 (1986), and J.E.B. v. Alabama, 511 U.S. 127 (1994). Specifically, Pressley argues that because 18 of the prosecution's 23 peremptory strikes were against women, and because there was only one black juror remaining after strikes, the trial court erred when it denied the motions on the basis that Pressley had not made a prima facie case of racial or gender discrimination.
The record reflects that, during the exercise of the peremptory strikes, the prosecution complained that Pressley had used 7 of his first 10 strikes to remove white males from the jury. Pressley countered with an observation that the prosecution had used 7 of their first 10 strikes to remove women. We note that the jury consisted of nine women and three men, with a male and a female as alternate jurors. There was one black juror and one black alternate juror. (C.R. 81-82.)
After the peremptory strikes, the prosecution made a Batson motion, alleging that Pressley had discriminated against white males by using 14 of his 22 strikes to remove white males from the jury. The prosecution argued that 40% of the venire had been white males, but with only 3 males on the jury, the percentage of males on the jury was 25%. (R. 1057-58.) Pressley then made a Batson motion, alleging that the prosecution's strikes discriminated against blacks because the prosecution struck four blacks from the venire, leaving only one black person on the jury. Pressley then made another motion, this time alleging that the prosecution's strikes also discriminated against women because the prosecution had used 18 of its 23 strikes to remove women from the jury. The prosecution responded that the State was forced to use most of its strikes against women because Pressley was striking all the white males. (R. 1060-61.) In arguing that Pressley had not made a prima facie showing of discrimination against blacks, the prosecution stated that blacks made up approximately seven percent of the population of Shelby County and that with one black remaining on the jury, eight percent of the jury was black — and also noted that one of the alternate jurors was black. Pressley had nothing further to offer to support his motions. The trial court denied the prosecution and defense motions without finding that either party had made a prima facie showing of discrimination. (R. 1063-64.)
In regards to the Batson motions alleging that the prosecution discriminated against female and black veniremembers, we have reviewed the record in light of the factors set out in Ex parte Branch,526 So.2d 609 (Ala. 1987). We do not find sufficient evidence that the female veniremembers who were struck shared only the characteristic of gender. Nor do we find sufficient evidence that the black veniremembers who were struck shared only the characteristic of race. We find nothing in the type and manner of the prosecutor's statements or questions during the extensive voir dire examination that indicated an intent to discriminate against female or black veniremembers. We do not find a lack of meaningful voir dire directed at the female or black veniremembers. Nothing in the record indicates that female jurors and male jurors, or black jurors and white jurors were treated differently by the prosecution. There is no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against females or blacks. We find only that the prosecutor used many of his strikes to remove women from the venire and that he struck four blacks from the venire. "Without more, we do not find that the number of strikes this prosecutor used to remove women [or blacks] from the venire is sufficient to establish a prima facie case of gender [or racial] discrimination." Ex parte Trawick, 698 So.2d 162, 168 (Ala.), cert. denied, 522 U.S. 1000,118 S.Ct. 568 (1997); Ex parte Branch, 503 So.2d at 622-23; Ex parte Thomas,659 So.2d 3 (Ala. 1994). *Page 130 
 VII.
Pressley argues that the trial court erred by denying his motion challenging the venire on the basis that blacks were unrepresented on the venire. Pressley bases his argument on the fact that he was a black male accused of murdering two white persons, and that there was only one black juror on the jury that decided his fate.
The record reflects that blacks make up approximately seven percent of the population of Shelby County. Nine percent of the venire was black (8 blacks on a 87-person venire). After excusals and challenges, the venire was 8.8% black (5 blacks in the remaining 57 members of the venire). After peremptory challeges, there was 1 black juror and 11 white jurors.
The test to determine whether the fair cross-section requirement of theSixth Amendment to the United States Constitution has been violated is as follows:
 "`In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'
"Duren v. Missouri, 439 U.S. 357, 364 (1979)."
Pierce v. State, 576 So.2d 236, 241 (Ala.Cr.App. 1990), cert. denied,576 So.2d 258 (Ala. 1991).
Pressley has the burden of establishing a prima facie case of a "fair cross-section" violation. Rayburn v. State, 495 So.2d 733 (Ala.Cr.App. 1986). He has failed to meet this burden. Pressley's argument that blacks were underrepresented on the venire was as follows:
 "[W]e're just trying to get . . . a fair cross-section of the community. I know that the African-American population is a small portion of this county, but we [will be lucky if] we have one or two black people on this jury. This case has just got . . . racial overtures . . . whether we want to admit it or not . . . . And that is a problem."
(R. 54-55.) Pressley's desire to have more black members in the venire so that there would be more blacks on the jury is not a sufficient reason to conclude that blacks were not fairly represented on this jury venire. Travis v. State, [Ms. CR-92-0958, April 18, 1997], ___ So.2d ___, ___ (Ala.Cr.App. 1997); Stewart v. State, 730 So.2d 1203, 1212 (Ala.Cr.App. 1997).
 "[E]ven if [the appellant] had demonstrated that blacks were underrepresented on the jury venire, he failed to show that this was due to the systematic exclusion of blacks in the selection process of the jury venire list. [The appellant] presented no evidence that blacks were systematically excluded from the jury venire list in [Shelby] County. `The United States Constitution "does not require an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service."' Pierce [v. State] 576 So.2d [236] at 241-42 [(Ala.Cr.App. 1990)], quoting Jackson v. State, 549 So.2d 616, 619 (Ala.Cr.App. 1989)."
730 So.2d at 1238.
Because Pressley has failed to prove that blacks were underrepresented on his jury venire due to a systematic exclusion of blacks in the jury selection process, his claim is without merit. Ex parte Land,678 So.2d 224, 244 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308
(1996); Burleson v. City of Daphne, 599 So.2d 1251, 1252 (Ala.Cr.App. 1992). *Page 131 
 VIII.
Pressley argues that the trial court erred when it admitted into evidence a videotape discovered by police that depicts the robbery and the murder. The police discovered the videotape in a recorder hidden in the manager's office of the pawnshop. The recorder was connected to a surveillance camera mounted in the area of the pawnshop where the merchandise was displayed. Pressley argues that the videotape was inadmissible because the State presented no witness who could: (1) show that the device or process or mechanism that produced the videotape was capable of recording what a witness would have seen or heard had a witness been present at the scene; (2) show that the operator of the device was competent or that the process or mechanism by which the recording was made was trustworthy; or (3) establish the authenticity and correctness of the resulting videotape. See Voudrie v. State, 387 So.2d 248
(Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala. 1980). Pressley argues that the State, therefore, did not extablish a proper predicate under the "silent witness" theory.
 "`The `silent witness' theory is that a [videotape] is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the [videotape] is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness's senses, and because the process or mechanism is explained before the [videotape] is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the [videotape] records.
 "`. . . Under the "silent witness" theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the "silent witness" theory is used, the party seeking to have the [videotape] admitted into evidence must meet the seven-prong Voudrie test.'"
Ex parte Rieber, 663 So.2d 999, 1008 (Ala. 1995).
Pressley argues that the State did not meet any of the three tests of Voudrie, as set out above.
The surveillance videotape in the present case depicts scenes in which no one who testified as a witness for the State appears, i.e., only John Burleson, Janice Littleton, and the robbers appear in the videotape. Therefore, the admissibility of the videotape must be analyzed under the "silent witness" theory. Our review of the record indicates that the State laid the necessary evidentiary foundation for admitting the surveillance videotape. Sergeant Russell Yawn of the Shelby County Sheriff's Office testified that, because of his experience and expertise with video equipment, he was assigned the task of searching the pawnshop for surveillance equipment. He testified as follows:
 "A [Sergeant Yawn]: In the office area — back behind the area where the medics were attending to Ms. Littleton and the body of Mr. Burleson — there was an office area. And in looking around the office area I found a television and a consumer VCR [videocassette recorder] laying on its side next to the television. I checked that VCR and found there was not a tape inside. As I continued to look around the office area, I discovered hidden up under a counter a commercial type VCR. And I noticed that the record light was still illuminated indicating to me that it was still in the record mode.
"Q [Prosecutor]: What did you do then?
 "A: I hit the stop button and then hit the eject button, getting the tape out of the VCR, recognizing the potential of this videotape. And I removed the little plastic tab on the rear of the videotape and then put the tape back in — *Page 132 
"Q: What does that do, removing that plastic tab?
 "A: It prevents an accidental or any other further recording.
 "Q: Prevents anything from being erased that's on there?
"A: That is correct.
 "Q: In other words, the VCR won't go to record mode with that tab out?
"A: That is correct.
 "Q: Now, Russell, what kind of experience have you had to — in working with video?
 "A: With my former employer there was a — one of the first little schools that you attend, the company school — there was a block of instructions to include surveillance equipment, specifically closed circuit television systems as well as our field cameras. After that school, I was either responsible for or assisted in the maintenance and upkeep of probably 20 surveillance systems. These systems were primarily located in the banks or other financial institutions and they were primarily multiple-camera systems with time lapse video recorders, time-of-day generators, and video switchers.
 "Q: All right, sir. Russell, then did you have some training and experience in this area?
"A: Yes, sir, that's correct.
 "Q: Did you have an occasion then or maybe a little later to go outside and observe the camera that made these pictures?
"A: Yes, sir, I did.
"Q: Did you see it in place?
"A: Yes, sir, I did.
"Q: Did it appear to you to be intact?
"A: Yes, sir, it did.
"Q: Did it have any damage to it?
"A: None that I was able to detect.
 "Q: Did you have an occasion to observe the videotape that you testified in taking out of that?
"A: Yes, sir, I have.
 "Q: Now, you previously testified that you came into the store and some of you talked right there in front of the store, I think, and then you went about your job?
"A: Yes, sir.
 "Q: Would that videocamera, had it been working properly, made pictures of that?
"A: Yes, sir, it would have.
 "Q: When you observed this videotape later, did it, in fact, make pictures of that?
"A: Yes, sir, it did.
 "Q: From that did you draw the conclusion that the videocamera was working properly?
"A: Yes, sir, I did.
 "Q: Did the camera correctly record what you did when you came in the store?
"A: Yes, sir, it did.
 "Q: It showed what you did when you walked in, who the others are talking to?
"A: Yes, sir.
"Q: It also showed the paramedics there?
"A: Yes, sir.
"Q: So, it appeared to be authentic to you?
"A: Yes, sir."
(R. 1381-85.) Sergeant Yawn then identified the exhibit as the videotape he had removed from the surveillance VCR at the pawnshop, testified that it was kept in his sole custody, except for a day when it was released to the FBI, and testified that it was in the same condition at trial, and that there had been no changes on the videotape, as when he first viewed the videotape. It was after this testimony that the trial court admitted the surveillance videotape into evidence.
By calling a witness with expertise in surveillance camera systems, the State properly established that the pawnshop's surveillance system was in proper working *Page 133 
order and capable of recording accurately what was happening in the area of the pawnshop it was focused on. Sergeant Yawn's testimony indicated that the videotape recording was correct and authentic. Therefore, the State properly satisfied the elements of the Vondrie test as articulated by the Alabama Supreme Court in Ex part Rieber, supra.
 IX.
Pressley argues that the trial court erred in admitting into evidence "several photographs" of the crime scene and the victims. He argues that the facts represented in the photographs of the crime scene (State Exhibits 3-34) were not in dispute and that the sheer number and the cumulative nature of the photographs were prejudicial.
Photographic evidence is admissible in criminal prosecutions if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991). The admission of photographic or videotape evidence is completely within the discretion of the trial court. Stewart v. State, 443 So.2d 1362, 1364
(Ala.Cr.App. 1993). Matters resting in the sound discretion of the trial court will not be disturbed, absent a clear abuse of discretion. Pace v. State, 284 Ala. 585, 226 So.2d 649 (Ala. 1969).
"The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative." Land v. State, 678 So.2d 201, 207 (Ala.Cr.App. 1995). Photographic exhibits are admissible even though they are demonstrative of undisputed facts. Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App. 1986), cert. denied, 506 So.2d 372 (Ala. 1987).
The trial court's decision to allow these photographs into evidence did not constitute an abuse of discretion.
 X.
Pressley argues that his due process rights were violated when the trial judge allowed what he alleged was irrelevant evidence to be admitted into evidence. Specifically, Pressley lists six items of evidence introduced at trial that, he argues, were irrelevant. Pressley does not state why he believes this evidence was irrelevant, or how its admission prejudiced him. He merely provides a laundry list of the evidence he claims was irrelevant.
"The appellate courts of Alabama have sanctioned a liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence, § 21.01(1) (5th ed. 1996).
 "Evidence is relevant if it has `any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.'"
Mitchell v. State, 473 So.2d 591, 594 (Ala.Cr.App. 1985).
"Trial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion." Hayes v. State,717 So.2d 30, 36 (Ala.Cr.App. 1997), cert. denied, 717 So.2d 30 (Ala. 1998).
 A.
Photograph of LaSamuel Gamble and two young women laughing and holding money, with the following notation on the back of the photograph:"Tina, Angel Maine."
When Pressley objected at trial on relevancy grounds to the introduction of *Page 134 
the photograph of LaSamuel Gamble and two young women laughing and holding money, the prosecutor responded:
 "Judge, that picture was taken out at the Kingston search warrant. When we go in we find evidence there of this robbery: gun tags, the jewelry tags, the garbage can of our robbery, the guitar case, all of
 those items. What we're trying to do is show that once this robbery was done, they went back to this particular residence. [W]e have got to show identity . . . . That picture shows that `Main', a/k/a LaSamuel Gamble, who was a co-defendant on that videotape was living in that house with his mother."
(R. 1264.)
The photograph of LaSamuel Gamble found at the Birmingham residence where stolen items from the pawnshop were discovered further identified the person recorded on the surveillance videotape. The photograph was part of the trail of evidence that eventually led to the arrest of Pressley and Gamble. Evidence is relevant if it has probative value, regardless of how slight, upon a matter in issue. Newsome v. State,570 So.2d 703 (Ala.Cr.App. 1989). The trial court did not err in admitting the photograph. Peeples v. State, 601 So.2d 186 (Ala.Cr.App. 1992).
 B.
The police videotape of LaSamuel Gamble's residence in which property taken from the pawnshop was recovered.
Pressley objected to the introduction of this videotape because, he argued, "the actual videotape just shows . . . a nasty, nasty, dirty apartment . . . . [T]he prejudicial value of that is to show these are . . . just dirty, nasty people." (R. 1306.) The prosecutor responded that the apartment did not belong to Pressley, but was "the house of LaSamuel Gamble's mother." The prosecutor proffered that the videotape recorded the "first real break that we had in the case and [when we] knew that we were on the right track." (R. 1306.) He pointed out that the videotape recorded the location in Gamble's residence where much of the property taken from the pawnshop was recovered.
Like the photograph of Gamble, this videotape tied LaSamuel Gamble, who was seen in the videotape of the robbery with Pressley, with property taken from the pawnshop. Like the photograph, the videotape recorded part of the trail of evidence that eventually led to the arrest of Pressley and Gamble. The trial court did not err in admitting the videotape. Newsome v. State, supra.
 C.
Sergeant DeHart's testimony concerning the number of law enforcement agencies that participated in the investigation of the case.
During the direct examination of Sergeant Mike DeHart, the prosecutor asked, "How many different police agencies and who are they that assisted you in this investigation?" (R. 1373.) Defense counsel objected on relevancy grounds and the trial court overruled the objection. Evidence was submitted at trial, without objection, that the investigative trail in this case led from Shelby County, to Birmingham, to Boston, Massachusetts, and, eventually, to Norfolk, Virginia. There was evidence before the jury that police from these jurisdictions, along with the FBI, had been involved in different aspects of the investigation. It was, therefore, not improper for the prosecutor to ask the police investigator to summarize the number of police agencies involved in the investigation of this robbery/murder. Newsome v. State, supra.
 D.
Police identification of LaSamuel Gamble's gun found in Boston.
During the direct examination of Sergeant Russell Yawn, the prosecutor *Page 135 
asked him to identify a unique, western-style revolver. Sergeant Yawn testified the gun was found during the search of an apartment in Boston, Massachusetts. When the prosecutor asked Sergeant Yawn if that gun was later identified as belonging to LaSamuel Gamble, Pressley objected on the ground of relevance and because, he said, a proper predicate had not been established. The trial court correctly overruled the objection. That gun was, again, part of the trail of evidence that led police to follow Gamble and Pressley from the pawnshop in Shelby County to Boston and, finally, to Norfolk, Virginia. It was relevant for the prosecution to explain how the police followed the trail of evidence that led to Pressley's arrest. Newsome v. State, supra.
 E.
Arresting officer's description of Pressley's demeanor at the time of his arrest.
During the direct examination of John Harley, a special agent for the FBI who arrested Pressley in Norfolk, Virginia, the following occurred:
 "Q [Prosecutor]: Describe for us, if you would, Mr. Pressley's demeanor at the time of his arrest.
 "MR. ROBBINS [Defense counsel]: Judge, we object to that.
"Q: How did he act?
"THE COURT: I will overrule.
"Q: Go ahead, sir.
 "A: When we were taking him down the fire escape he — when the people were out there, he got a smile on his face and he smiled the whole way down until we put him in the police car, including when he made the statement to me.
"Q: You are talking about the last statement?
"A: The last statement.
"Q: `I will come back and get you?'
"A: `I will come back and get you.'"
(R. 1525.) Because Pressley's objection was nonspecific, we review the allegation of error under the plain error rule. Rule 45A, Ala.R.App.P.
This court has held:
 "`[A]ny conduct or declaration of a person having relation to the offense he is suspected of or charged with, indicating a consciousness of guilt, is admissible evidence against him.' Knox v. State, 571 So.2d 389, 391 (Ala.Cr.App. 1990), quoting Sparks v. State, 376 So.2d 834, 843 (Ala.Cr.App. 1979). Also, `[t]he acts, declarations and demeanor of an accused before or after the offense whether part of the res gestae or not are admissible against him.' Id., quoting Smoot v. State, 376 So.2d 834, 843
(Ala.Cr.App. 1980)."
Lowe v. State, 627 So.2d 1127, 1131 (Ala.Cr.App. 1993).
Pressley's demeanor and the threats he made to the arresting officer were admissible to prove consciousness of guilt. Sheridan v. State,591 So.2d 129, 131 (Ala.Cr.App. 1991). There is no plain error here.
 F.
Description of the neighborhood where Pressley was arrested as being "a kind of Muslim community."
When Agent Hurley was asked to describe the area surrounding the apartment where Pressley was found and arrested, Hurley responded, "The apartment complex . . . is in the middle of what could be described as a kind of Muslim community." (R. 1523.) Pressley objected as to relevance and moved to strike the response. The trial court sustained the objection and ordered the jury to disregard "that aspect from their consideration."
"There is a prima facie presumption against error when the trial court immediately charges the jury to disregard the improper remarks." Daniels v. State, 650 So.2d 544, 557 (Ala.Cr.App. 1994). In this case, Pressley's objection was *Page 136 
sustained, and the jury was instructed to disregard the comments of the FBI agent. Thus, Pressley received a favorable ruling on the only action requested. There was no adverse ruling upon which error can now be predicated. Stennett v. State, 340 So.2d 65, 67 (Ala. 1976).
 XI.
Pressley argues that the trial court made several errors concerning the admissibility of statements he made to police. We will discuss each of these arguments separately.
 A.
Pressley first argues that the trial court erred in not suppressing the statements he made to police in Norfolk, Virginia, and in Shelby County. Pressley bases his argument on the fact that, the first time he was read his Miranda rights[4] by Norfolk police investigators preceeding his initial interrogation, he was not advised of his Alabama "juvenile Miranda rights" pursuant to Rule 11A, Ala.R.Juv.P.
"`Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is upon the state to show voluntariness and a Miranda predicate in order for them to be admitted.'" Mitchell v. State, 706 So.2d 787, 801 (Ala.Cr.App. 1997) (citations omitted).
 "The general rule is that for a confession to be admissible the state must show that the defendant was advised of his rights, as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966), and its progeny, and that the defendant gave the statement after making a voluntary and knowing waiver of those rights. Bush v. State, 523 So.2d 538
(Ala.Cr.App. 1988); Magwood v. State, 494 So.2d 124
(Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)."
Robinson v. State, 698 So.2d 1160, 1162 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 1165 (Ala. 1997). "`Whether a waiver is voluntarily, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused.'" Langley v. State, 641 So.2d 339,340 (Ala.Cr.App. 1994) (citations omitted).
 "`"`(1) The test for voluntariness involves a consideration of the totality of the circumstances. (2) "The admissibility of confessions is for the court, their credibility is for the jury." (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. "(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. "Review of the court's action is limited to determining whether its finding was clearly erroneous."'"'"
Fox v. State, 659 So.2d 210, 214-15 (Ala.Cr.App. 1994), quoting Whittle v. State, 518 So.2d 793, 796 (Ala.Cr.App. 1987), quoting other cases (citations omitted). This court's decision in Anderson v. State,729 So.2d 900 (Ala.Cr.App. 1998) held that police had to inform a 16 year-old murder suspect of his rights under Rule 11A, Ala.R.Juv.P. before a custodial interrogation, even though he suspect may be ultimately charged and tried as an adult. With these principles before us, we now turn to the *Page 137 
facts surrounding Pressley's statements to the police.
According to the record, Pressley was arrested in Norfolk, Virginia, on August 9, 1996. Norfolk homicide detective David Mark Goldberg and his partner interrogated Pressley after his arrest, with the permission of the Shelby County district attorney's office. Before the interrogation, Detective Goldberg saw to it that Pressley was fed; then he introduced himself, and advised Pressley of his Miranda rights. Detective Goldberg testified that Virginia has only one legal-rights form for both juveniles and adults and that there are no special rights that juveniles are given. (Suppression hearing transcript [S.H.] 44-45.) According to Detective Goldberg, Pressley informed him that, although he was 16 years old, he was emancipated. Detective Goldberg said,
 "I asked him, `Being emancipated means you went in front of a court and they so deemed that you were an adult?' He stated, `Yes.' He never asked for any kind of a parent or lawyer."
(S.H. 23.) According to Detective Goldberg, he fully advised Pressly of his Miranda rights, and Pressley acknowledged each right. Detective Goldberg testified that Pressley did not appear intoxicated or unable to understand his rights. He said that the investigators did not intimidate or coerce Pressley and that Pressley stated that he understood each of his rights and consented to the interrogation. According to Detective Goldberg, he took three oral statements from Pressley, each one different from the one before. The investigators recorded a fourth and final statement and returned Pressley to his holding cell.
On August 12, 1996, Detective Goldberg was advised by Shelby County investigators that Pressley should be advised of his rights using an Alabama juvenile Miranda rights form. Detective Goldberg testified that he returned to Pressley with the statement that had been recorded on August 9th and readvised Pressley of his rights pursuant to Rule 11A, Ala.R.Juv.P. Pressley acknowledged that he understood his Alabama juvenile rights, reviewed and reconfirmed the statement he had given on August 9, declining to make any changes or to add to it. Detective Goldberg said that Pressley never asked to speak to a parent or guardian.
Detective Goldberg testified that he contacted Pressley's grandmother, Sarah Collins, whose number Pressley provided when Goldberg asked for Pressley's mother's telephone number, to advise her that Pressley had been arrested and that he was in Norfolk, Virginia. According to Detective Goldberg, Ms. Collins never asked to speak with Pressley, but expressed relief that he had been arrested because she had feared for his life. Her only question was when Pressley would be returning to Alabama. (S.H. 51-52.)
On August 19, 1996, after Pressley had returned to Alabama, he was interviewed in Shelby County by Investigator Mike DeHart. According to Investigator DeHart, before any questioning, he advised Pressley of his Alabama juvenile rights pursuant to Rule 11A, Ala.R.Juv.P. DeHart testified that Pressley stated that he understood his rights and consented to make a statement. At no time during the interview, did Pressley ask to speak with a parent, guardian, or a lawyer. DeHart stated that he did not coerce, threaten, or make any promises of leniency to Pressley in return for a statement. DeHart testified that Pressley's statement was recorded on a videorecorder hidden in the interview room. (S.H. 157-83; R. 1533-43.)
In his brief to this court, Pressley complains that the trial court erred in not suppressing the statements made to police in Norfolk, Virginia, and in Shelby County. However, the record reflects that the only statement admitted into evidence at trial was a redacted version of the videotaped statement Pressley made to investigators in Shelby County. (R. 1566-68, 1571.) *Page 138 
 "The threshold for admissibility of any criminal defendant's statement is voluntariness. Tague v. Louisiana, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622
(1980). In determining whether a statement was voluntary, courts must use a totality-of-the-circumstances test. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378
(1981); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The courts must conclude that the defendant `"made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him."' Ex parte Pardue, 661 So.2d 268, 270 (Ala. 1994), quoting Jackson v. State, 562 So.2d 1373, 1380-81 (Ala.Cr.App. 1990). Furthermore, a finding regarding the voluntariness of a confession will not be disturbed unless that finding is contrary to the great weight of the evidence and manifestly wrong. A.M. v. State, 623 So.2d 421 (Ala.Cr.App. 1993)."
Smith v. State, [Ms. CR-94-2205, March 6, 1998] 727 So.2d 147, 163
(Ala.Cr.App. 1998).
An examination of the totality of the circumstances in this case supports the trial court's determination that Pressley's videotaped statement to Shelby County investigators was voluntary and therefore admissible. Without deciding whether a police investigator in a foreign jurisdiction is required to comply with Alabama procedural rules before interrogating an Alabama suspect[5], we find that, in this case, Pressley was adequately advised of his Alabama juvenile rights by Norfolk, Virginia, investigators, so that his subsequent statement to Alabama investigators was a result of a fully informed choice by Pressley. The evidence supports the trial court's decision that Pressley was capable of making an informed decision and that he was not pressured or coerced into making a statement to the Shelby County investigators. Admission of Pressley's statement into evidence was not an abuse of discretion; the trial court's ruling on this issue is affirmed. Scott v. State, 555 So.2d 763, 766 (Ala.Cr.App. 1988).
 B.
Pressley next complains that the trial court erred in not suppressing that portion of the videotaped statement that showed Pressley, alone in the police interrogation room, removing a copy of the crime scene videotape from a VCR and attempting to destroy the tape. Pressley claims this portion of the videotaped statement was "irrelevant and highly prejudicial." As discussed in Part X. of this opinion, Pressley's conduct in attempting to destroy incriminating evidence was clearly relevant and admissible as evidence of his consciousness of guilt. Lowe v. State,627 So.2d 1127, 1131 (Ala.Cr.App. 1993). This issue is without merit.
 C.
Lastly, Pressley complains that the portion of his statement where "the Defendant and Sergeant DeHart had discussions about .25 caliber guns and other crimes" was inadmissible. Pressley argues that "these crimes were highly prejudicial and should have been excluded under Rule 404(b) of the Alabama Rules of Evidence." Pressley does not specifically allege what these discussions of "other crimes" were. A review of the record indicates that the prosecution redacted from Pressley's videotaped interrogation all discussions of other offenses under investigation by Shelby County investigators. (R. 1544-46.) The only specific complaint *Page 139 
Pressley made at trial about the redacted videotape concerned that part of the videtape where Pressley stated that he "likes big guns," that he "ain't going to get [someone] to do anything with a .25, it's got to be a .380 or bigger." (R. 1554, 1572.) Pressley argued that his statement inferred that he committed other crimes. The trial court responded, "No, I don't think he made reference to any other crimes." (R. 1572.) We agree. Pressley's reference to his preference for "a .380 or bigger" is relevant because evidence indicated the shooter used a .380 handgun to kill Mr. Burleson and Ms. Littleton. The trial court did not err in admitting that portion of the videotaped statement. Newsome v. State,570 So.2d 703 (Ala.Cr.App. 1989).
 XII.
Pressley argues that the trial court erred by giving a "confusing" instruction on the elements of felony murder. Specifically, Pressley argues that the jury may not have been aware that felony murder could be committed during the commission of a robbery in the first degree because the court's instruction stated that "[a] person commits a crime of felony murder if he commits a robbery in any degree and in the course of the crime and in furtherance of the crime he is committing he causes the death of any person." (R. 1664.) At trial, Pressley asked the trial court to "clarify" the felony-murder instruction by advising the jury specifically that felony murder could result from the commission of a robbery in the first degree. The trial court stated that it had adequately covered the elements of felony murder and it declined to readvise the jury. (R. 1694.)
A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. United States v. Padilla-Martinez, 762 F.2d 942
(11th Cir.), cert. denied, 474 U.S. 952 (1985). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable — not a strained — construction. King v. State,472 So.2d 1092 (Ala.Cr.App. 1984).
 "Hypercriticism should not be indulged in in construing charges of the court (S. N.R.R. v. Jones, 56 Ala. 507; McGuire v. State, 2 Ala. App. 218, 223, 57 So. 57); nor fanciful theories based on the vagaries of the imagination advanced in the construction of the court's charge, which is usually as it is here, and as it should be expressed in plain language that is susceptible of the ordinary understanding."
Addington v. State, 16 Ala. App. 10, 19, 74 So. 846 (1916).
We note that the language the trial court used to explain felony murder to the jury mirrors the language in § 13A-6-2(a)(3), Ala. Code 1975, as well as the language in the Alabama Pattern Jury Instructions: Criminal, (3d ed. 1994). We find nothing in the record to indicate that the jury was confused by the straightforward language of the trial court's instruction or that the jury could have misconstrued the plain meaning of "robbery in any degree" so that they did not understand felony murder included a murder committed in the course of a robbery in the first degree. This issue is without merit.
 XIII.
Pressley argues that the trial court erred in not granting a mistrial because, during presentencing, Ms. Littleton's daughter and Mr. Burleson's widow "sobbed" as they testified about the impact the murders had on their families and because other family members cried in the courtroom during this testimony. Pressley argues that the emotional impact of this caused the jury to improperly base their death penalty recommendation on emotions. *Page 140 
After defense counsel made a motion for a mistrial on the ground that the witnesses and other family members sitting in the courtroom had been crying, the following occurred:
 "THE COURT: Well, at any rate, I will say this for the record, that apparently none of the family outside of the witness sobbed loud enough that I could pick them up because I never did hear them or see them. I don't know if they were or not.
 "MR. ROBBINS [Defense counsel]: I could hear them from the counsel table.
 "THE COURT: May be able to from back there and, or course, yeah, obviously I observed Ms. Burleson and her eyes were wet and she did wipe them one time, I think. I'm not sure she wiped them more than one time. She did wipe them.
 "MR. OWENS [Prosecutor]: She took her glasses off and wiped her face, Judge, but I don't recall seeing any open tears.
"THE COURT: I'm not sure if she did nor not."
(R. 1720.) After counsel argued over whether Ms. Burleson sobbed during her testimony, the trial court denied the motion for mistrial.
 "In McNair v. State, 653 So.2d 320, 329 (Ala.Cr.App. 1992), this court held:
 "`"[A]s a general rule, a demonstration by, or the misconduct of, a bystander or spectator during a criminal trial — including even a disturbance having a tendency to influence or disturb the jury — is not deemed to be sufficient reason for the granting of a new trial unless it appears that the rights of the accused were prejudiced thereby, and, generally, in the absence of a showing to the contrary, it will be assumed that the jury was not prejudiced; similarly, manifestations of grief by spectators related to the victim of a crime, as a general matter, will not alone furnish good ground for a new trial, a showing being required that the case of the accused was prejudiced by such conduct."
 "`Annot., 31 A.L.R.4th 229, 234-35 (1984). This same rule also applies to emotional manifestations made while testifying. 31 A.L.R.4th at 235-36 . . . . See Lee v. State, 265 Ala. 623, 627, 93 So.2d 757 (1969) (wife of deceased murder victim "sobbing" while testifying). This rule applies in capital cases. See Henderson v. State, 583 So.2d 276, 287 (Ala.Cr.App. 1990), aff'd 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
 "`The emotional manifestations present rise nowhere near the level presented in Collum v. State, 21 Ala. App. 220, 221, 107 So. 35, 35-36 (1926) (new trial required where in a prosecution for seduction, the prosecutrix fainted in the witness chair, and mother came to her aid weeping and crying, "Nobody knows how much we have suffered over this trouble. Lord have mercy on us.") and White v. State, 25 Ala. App. 323, 324, 146 So. 85 (1933) (new trial required where widow of murder victim contradicted defense counsel during his closing argument.)
 "`Here, as in Smith [v. State], 37 Ala. App. [116], 118, 64 So.2d [620], 621 [cert. denied, 258 Ala. App. 647, 64 So.2d 622 (1953)]: "The trial judge witnessed the incidents. To him must of necessity be committed a wide discretion in determining whether or not the occurrences affected the rights of the accused to a fair, impartial trial." We find no merit to the appellant's argument that the prosecution should have been required to call witnesses who were not members of the victim's family.'"
DeBruce v. State, 651 So.2d 599, 608-09 (Ala.Cr.App. 1993), aff'd,551 So.2d 624 (Ala. 1994).
"It is, of course, axiomatic that the grant or denial of a motion for mistrial is a matter within the sound discretion of the *Page 141 
trial court which will only be disturbed upon a showing of manifest abuse." Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967). The trial judge, who could observe the witnesses and family members in the courtroom during this time, was in a much better position than this court to determine whether the "sobbing" and crying affected Pressley's right to a fair and impartial trial. We cannot say that the trial judge abused his discretion by refusing to declare a mistrial. Weaver v. State,678 So.2d 260, 271 (Ala.Cr.App. 1995), rev'd on other grounds,678 So.2d 284 (Ala. 1996).
 XIV.
Pressley next argues that the trial court committed plain error when it failed to instruct the jury on the statutory mitigating circumstance of "no significant history of prior criminal activity," see § 13A-5-51(1), Ala. Code 1975. The record reflects that Pressley never asked the trial court to instruct the jury on that particular mitigating circumstance, never offered it as a mitigating circumstance to the jury, and never argued its existence during the sentencing phase of trial. Nonetheless, after receiving a presentencing report and conducting a sentencing hearing, the trial court found no significant history of prior criminal activity, and considered it as a statutory mitigating circumstance in its sentencing order. Pressley reasons that, because the trial court found the statutory mitigating circumstance to exist in its sentencing order, it was error for the court not to sua sponte recognize the existence of the mitigating circumstance and instruct the jury on it at trial. Because the existence of "no significant history of prior criminal activity" as a mitigating circumstance was never raised at trial, we review this issue under the plain error doctrine, Rule 45A, Ala.R.App.P.
Section 13A-5-45(g), Ala. Code 1975, states:
 "The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51
and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
It would seem from the language of § 13A-5-45(g) that Pressley — not the trial court — had the burden of at least offering "no significant history of prior criminal activity" as a mitigating circumstance. In Cochran v. State, 500 So.2d 1161, 1173 (Ala.Cr.App. 1984), aff'd in part, rev'd in part on other grounds, 500 So.2d 1179
(Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App. 1986), this court rejected an argument that the intent of the Legislature in passing the 1981 Death Penalty Act was to shift the burden to show mitigating circumstances from the defense. In his concurring opinion in Cook v. State, 369 So.2d 1251, 1260 (Ala. 1978), Justice Maddox remarked, "I disagree with any suggestion that the burden is on the state or the judge to proffer mitigating evidence — the only obligation on the state is, as Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954,57 L.Ed.2d 973 (1978)] holds, to permit the defendant to present mitigating evidence. Alabama permits that."
Pressley was not restricted from offering any mitigating circumstances. The only statutory mitigating circumstance he offered during the sentencing phase was his age.[6] The trial judge had no burden to recognize a statutory mitigating *Page 142 
circumstance not presented by the defense, and proffer it to the jury. The trial court instructed the jury on the statutory mitigating circumstance of age and then instructed it that it could consider "any aspect of the defendant's character or record and any of the circumstances or things that the defendant offers as a basis for a sentence of life imprisonment without parole." (R. 1769.) There is no requirement that the trial court read the entire list of statutory mitigating circumstances to a jury where there was no evidence offered to support each circumstance. Holladay v. State, 629 So.2d 673, 687
(Ala.Cr.App. 1992), cert. denied, 510 U.S. 1171 (1994). The trial court's instructions were sufficient. The trial court did not commit plain error by not sua sponte instructing the jury on a statutory mitigating circumstance not offered by Pressley.
 XV.
In reviewing the sentence of death, as we are required to do by §13A-5-53, Ala. Code 1975, we make the following findings: We have searched the record and have found no error in the sentencing proceedings adversely affecting Pressley's rights. Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire proceedings under review and found no plain error or defect that has, or probably has, adversely affected any substantial right of Pressley's.
The trial court found the existence of one aggravating circumstance: that the capital offense was committed during the commission of a robbery in the first degree, § 13A-5-49(4).
The trial court found the existence of two statutory mitigating circumstances: that Pressley did not have a significant history of prior criminal activity, § 13A-5-51(1), and that Pressley was 16 years old at the time of the crime, § 13A-5-51(7). The trial court did not find any nonstatutory mitigating circumstances. (C. 121-123.)
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record.
As required by § 13A-5-53(b)(3), we must determine whether Pressley's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. After our review of the surveillance videotape of this murder, we note that Pressley dispassionately and in cold-blood murdered a pawnshop owner and his clerk during the course of a robbery. The only emotion detected on the videotape was Pressley's frustration at the misfiring of his weapon. We note that at the time of this trial, two-thirds of Alabama death sentences were imposed upon convictions for robbery-murder. Kuenzel v. State, 577 So.2d 474, 530 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531
(Ala.), cert. denied, 502 U.S. 886 (1991); Henderson v. State,583 So.2d 276, 304 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908 (1992); Stephens v. State, 580 So.2d 11, 26
(Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859
(1991).
It is the determination of this Court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
Long, P.J., and McMillan, Brown, and Baschab, JJ., concur.
[1] The evidence shows that Pressley and Gamble discovered a videocassette recorder ("VCR") sitting next to the surveillance camera monitor in Burleson's office and that they removed the videotape from the recorder, obviously believing it was the tape of their robbery. That destroyed tape was later discovered in Gamble's residence. However, the VCR was a "dummy" recorder; the recorder that videotaped the robbery was hidden elsewhere in the office.
[2] Apparently, at this point in the record, Juror S. began to answer questions which were, at first, addressed to Juror W.
[3] Pressley also complains that Juror C.R. wrote in her questionnaire that she felt it would be a waste of taxpayer's money having someone in prison for life; that Juror L.W. and Juror P.B. responded "yes" to the following question in the jury questionnaire: "Do you believe that if a person is charged, they are probably guilty, or more than likely guilty?"; and that Juror L.W. also responded "yes" to the following questionnaire question: "Do you believe that [the testimony of law enforcement witnesses] should be given greater weight than other witness' testimony merely because they are law enforcement personnel?" However, the record of voir dire reflects that Juror C.R. stated that she realized every case was different and that her opinion would not prevent her from following the court's instructions. Juror L.W. and Juror P.B. were never questioned about these questions during their voir dire examination. These responses were not the basis for the challenges against these three jurors. Based on our review of the entire voir dire, we find no plain error in the trial court's failure to sua sponte remove these jurors from the venire based on their written responses. Rule 45A, Ala.R.App. P.
[4] Miranda v. Arizona, 384 U.S. 436 (1966).
[5] Although there is little Alabama law on this issue, we believe that the statements taken by Virginia investigators would be admissible in an Alabama court if the evidence showed that the Virginia investigators followed Virginia procedural requirements, even though Alabama procedural requirements were different. See United States v. Covington, 783 F.2d 1052,1056 (9th Cir. 1986).
[6] The record indicates that defense counsel was being very conservative in his presentation of evidence and argument as part of a trial strategy to prevent the admission of evidence of six other robberies in which store clerks were either murdered or shot, allegedly by Pressley and Gamble, during the same time frame as the charged murders. These collateral acts were admitted in Gamble's trial. This tactic would explain why defense counsel did not want to argue to the jury that Pressley had no significant history of prior criminal activity. *Page 143